**2:24-cv-10144-CCC**

---

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY
NEWARK VICINAGE**

---

**IN RE: NATIONAL REALTY INVESTMENT ADVISORS, LLC,
BANKRUPTCY APPEAL:**

AIRN LIQUIDATION TRUST CO., LLC, in its capacity as Liquidation
Trustee of the AIRN LIQUIDATION TRUST,
*Appellant*,

v.

MEDIA EFFECTIVE, LLC, et al.,
*Appellees*.

---

Appeal from the United States Bankruptcy Court
for the District of New Jersey
The Honorable John K. Sherwood, United States Bankruptcy Judge

---

**BRIEF ON BEHALF OF AMICUS CURIAE KEITH A. ALT,
ACTING CHIEF OF THE NEW JERSEY BUREAU OF SECURITIES**

---

JENNIFER DAVENPORT
ATTORNEY GENERAL OF NEW JERSEY
124 Halsey Street
P.O. Box 45029
Newark, New Jersey 07101
Phone: (973) 648-2500
Fax: (973) 648-4887

[[additional appearances on the following page]]

Brian F. McDonough (NJ Bar No. 026121980)
Assistant Attorney General
Brian.McDonough@law.njoag.gov
        *Of Counsel and on the Brief*

Rahul Kapoor (NJ Bar No. 423832023)
Deputy Attorney General
(609) 696-5293
Rahul.Kapoor@law.njoag.gov
        *On the Brief*

Toral M. Joshi (NJ Bar No. 026182003)
Deputy Attorney General
Toral.Joshi@law.njoag.gov
        *On the Brief*


*Counsel to Amicus Curiae Keith A. Alt, Acting Chief of the New Jersey Bureau of Securities*

## TABLE OF CONTENTS

TABLE OF CONTENTS......................................................................... i

TABLE OF AUTHORITIES ................................................................ ii

FED. R. BANKR. P. 8017(4)(C) STATEMENT ..................................... v

INTRODUCTION ............................................................................... 1

PROCEDURAL HISTORY & STATEMENT OF FACTS ..................... 2

ARGUMENT ...................................................................................... 4

I.    The Bankruptcy Court erred in its interpretation of "agent" as defined in the Securities Law................................................................................... 4

   A.    A plain reading of Section 49(b) of the Securities Law does not support the Bankruptcy Court's interpretation of "agent." ............................................. 4

   B.    The case law cited by the Bankruptcy Court does not support its conclusion. ................................................................................... 9

   C.    The practical implications of Bankruptcy Court's narrow interpretation of "agent" will hinder the Bureau's enforcement efforts to protect the investing public................................................................................... 13

II.   The Court erred in interpreting the scope of "aiding and abetting" liability under N.J. Stat. Ann. 49:3-71(d)...................................................... 17

## <u>TABLE OF AUTHORITIES</u>

**Cases**

*Abbotts Dairies, Inc. v. Armstrong,*
  102 A.2d 372 (N.J. Sup. Ct. 1954) ................................................................6

*Abrams v. Ohio Cas. Ins. Co.,*
  731 A.2d 48 (N.J. Super. Ct. App. Div. 1999) ......................................... 9, 12, 13

*Affiliated Ute Citizens v. United States,*
  406 U.S. 128 (1972)................................................................................14

*Baker, Watts & Co. v. Miles & Stockbridge,*
  620 A.2d 356 (Md. Ct. Spec. App. 1993)..........................................................19

*Bennet v. Durham,*
  683 F.3d 734 (6th Cir. 2012) ....................................................................18

*CFT Seaside Inv. L.P. v. Hammet,*
  868 F.Supp. 836 (D.S.C. 1994)...................................................................19

*Cola v. Packer,*
  383 A.2d 460 (N.J. Super. Ct. App. Div. 1977) ....................................................14

*Cola v. Terzano,*
  322 A.2d 195 (N.J. Super. Ct. Law Div. 1974) ..................................... 13, 14, 18

*Estate of Cowart v. Nicklos Drilling Co.,*
  505 U.S. 469 (1992)..................................................................................6

*Higgins v. N.J. Bureau of Sec.,*
  241 A.2d 660 (N.J. Super. Ct. App. Div. 1968) ....................................................14

*In Re National Realty Investment Advisors, LLC, et al.,*
  No. 22-14539 (Bankr. D.N.J 2024) ...............................................................1, 2

*Johnson v. Colip,*
  658 N.E.2d 575 (Ind. 1995) ......................................................................19

*McCarthy v. Bronson,*
  500 U.S. 136 (1991)..................................................................................6

ii

*Paper Mill Playhouse v. Millburn Township*,
  472 A.2d 517 (N.J. Sup. Ct. 1984) ................................................................6

*Robinson v. Shell Oil Co.*,
  519 U.S. 337 (1997)........................................................................................5

*Rosenberg v. XM Ventures*,
  274 F.3d 137 (3d Cir. 2001).............................................................................6

*Sabella v. Lacey Twp.*,
  497 A.2d 896 (N.J. Super. Ct. App. Div. 1985) ...........................................14

*Santa Fe Med. Servs., Inc. v. Segal*,
  57 F.3d 342 (3d Cir. 1995)...............................................................................6

*SEC v. C. M. Joiner Leasing Corp.*,
  320 U.S. 344 (1943)........................................................................................14

*United States v. Ron Pair Enterprises, Inc.*,
  489 U.S. 235 (1989)..........................................................................................6

*Ward v. Bullis*,
  748 N.W.2d 397 (N.D. 2008) ........................................................................19

*Zendell v. Newport Oil Corp.*,
  544 A.2d 878 (N.J. Super. Ct. App. Div. 1988) ............................................ passim

**Statutes**

15 U.S.C. s.78o(h)..............................................................................................5

N.J. Stat. Ann. § 49:3-47 to –89 .......................................................................1

N.J. Stat. Ann. § 49:3-49(b).............................................................................. passim

N.J. Stat. Ann. § 49:3-49(j)(2) ..........................................................................7

N.J. Stat. Ann. § 49:3-71.................................................................................... passim

N.J. Stat. Ann. § 49:3-75....................................................................................13

P.L.1967, c.93 (C.49:3-50) ................................................................................5

**Other Authorities**

*Chasing the Rogue Professional After the Private Securities Litigation Reform Act of 1995*,
50 SMU L. Rev. 91 (1996) ...............................................................................18

Federal Rules of Bankruptcy Procedure 8017(4)(C) .....................................................v

*Secondary Liability for Securities Fraud: Gatekeepers in State Court*,
36 Del. J. Corp. L. 463 (2011) .........................................................................18

**Treatises**

*§ 9:71 Secondary Liability Under States' Securities Laws—Persons or Firms Who Participate in or Materially Aid the Purchase or Sale—Material Aid or Participation*,
12A Blue Sky Law § 9:71 ..................................................................................17

## **FED. R. BANKR. P. 8017(4)(C) STATEMENT**

Jennifer Davenport[1], Attorney General of the State of New Jersey, on behalf of Amicus Curiae Keith A. Alt, Acting Chief of the New Jersey Bureau of Securities, through Rahul Kapoor, Deputy Attorney General, states the following pursuant to Federal Rule of Bankruptcy Procedure 8017(4)(C):

1) No party or party's counsel authored this brief in whole or in part;

2) No party or party's counsel contributed money that was intended to fund preparing or submitting this brief; and

3) No person, other than the Amicus Curiae and its members, contributed money that was intended to fund preparing or submitting this brief.

---

[1] The filings in this matter were commenced by former Attorney General Matthew Platkin on behalf of then Chief of the New Jersey Bureau of Securities, Elizabeth M. Harris. This filing has been revised to reflect the present Attorney General, Jennifer Davenport, and Acting Bureau Chief, Keith A. Alt.

v

## INTRODUCTION

This *amicus curiae* brief is respectfully submitted on behalf of Keith A. Alt, Acting Chief of the New Jersey Bureau of Securities ("Bureau Chief") in support of the appeal by Appellant AIRN Liquidation Trust Co. ("AIRN") of the October 11, 2024 Decision ("Bankruptcy Decision") of the United States Bankruptcy Court for the District of New Jersey, *In Re National Realty Investment Advisors, LLC, et al.*, No. 22-14539 (Bankr. D.N.J 2024). The Bankruptcy Court's decision dismissing Count III of AIRN's Verified Amended Complaint, which asserted claims of aiding and abetting securities fraud as to Media Effective, LLC ("Media Effective") and Javier Torres ("Torres") under the New Jersey Uniform Securities Law (1997), N.J. Stat. Ann. § 49:3-47 to –89 (the "Securities Law"), misinterpreted both the scope of the term "agent" under N.J. Stat. Ann. § 49:3-49(b) and the scope of aider and abettor liability under the private civil liability provisions of N.J. Stat. Ann. § 49:3-71.

The Bureau Chief submits this brief to offer insight and clarity on the meaning of both provisions, as well as the effect the Bankruptcy Court's unduly narrow ruling may have on both the Bureau's ability to enforce the Securities Law and the ability of investors to vindicate their rights under its private civil liability provisions. Clarity as to the meaning of the term "agent" and consistency in the application of the aider and abettor liability provision of the Securities Law are in the public interest

because both are paramount to the Bureau's enforcement efforts and the investing public's ability to seek appropriate recoveries when harmed.

**PROCEDURAL HISTORY & STATEMENT OF FACTS**

The Bureau Chief generally relies on the procedural history and the findings of fact in the Bankruptcy Decision. *See* Bankruptcy Decision, *3-26. Some salient facts from the Bankruptcy Decision are mentioned below.

NRIA operated a "massive Ponzi Scheme," which purported to guarantee investors return rates. *Id*. at 2. Thomas Nick Salzano ("Salzano") was one of the primary architects of the Ponzi scheme and plead guilty to, among other things, securities fraud in the District Court of New Jersey.[2] *Ibid*.

NRIA was Media Effective, LLC, and its owner and sole employee, Javier Torres' (collectively "Appellees"), only client and were paid approximately $36 million dollars between 2012 and 2022 for advertising services designed to attract new investors. *Id*. at 7. Media Effective was an authorized agent to buy media and negotiate on NRIA's behalf. *Id*. at 8. Torres referred to Salzano as a "trusted partner," *Id*. at 9, and said that "he always took [his] direction from Salzano." *Ibid*. Salzano referred to Torres as NRIA's "Media Manager." *Ibid*.

Media Effective and Torres provided comprehensive services to NRIA, including meeting with media vendors, soliciting research data and media

---

[2] *See* U.S. District Court of New Jersey, Case No. 22-00690, [ECF No. 86].

2

information, and coordinating media delivery, scheduling, and implementation. *Id*. at 8. In addition, Torres negotiated media plans and secured media pricing. *Ibid*. NRIA's media plan was a direct response, "call to action," plan which included motivating listeners to contact NRIA if interested based on the advertisement. *Ibid*. NRIA hired closers to field the calls and secure investments in NRIA. *Ibid*.

Torres and Media Effective helped develop the advertisements to best target males over the age of 55 with over $1 million in assets and $250,000 in annual income. *Id*. at 9. Media Effective helped to ensure that NRIA was able to advertise on certain channels, and get exposure to investors, by finding work arounds to certain advertiser's requirements. For example, on January 20, 2021, Torres informed NRIA's Director of Advertising and Marketing that Lou Dobbs was "not comfortable without an understanding" of NRIA's 10% guaranteed return. Torres drafted a script example to work around Lou Dobbs' concern about the guaranteed return, which did not address why NRIA could provide a guarantee. *Id*. at 11.

In 2019, Torres brainstormed ways to work around screenings. *Id*. at 14. The Bankruptcy Court noted that because NRIA was his only client, Torres should have had intimate knowledge of NRIA's business and personnel. *Id*. at 13. The Court further noted that Torres "was involved in the process of trying to substantiate NRIA's guaranteed return claims in some cases, and in others, he conspired with Mr. Salzano to avoid any scrutiny of NRIA's advertisements." *Id*. at 14.

3

Salzano was arrested in March 2021. *Id*. at 15. Although Torres denied knowledge of any wrongdoing by NRIA, the Court found, taking all facts into consideration, Torres was on inquiry notice that NRIA may have been using advertisements to defraud investors as of April 2021. *Id*. at 16. The ads placed by Media Effective were a critical component of the Ponzi scheme orchestrated by NRIA. *Id*. at 28.

Without new investors, the scheme would have failed much earlier.

## **ARGUMENT**

### I. **The Bankruptcy Court erred in its interpretation of "agent" as defined in the Securities Law.**

This Court should reverse the Bankruptcy Court's dismissal of Count III of AIRN's Verified Amended Complaint for three reasons: 1) the Bankruptcy Court's interpretation of "agent" is not supported by the plain reading of the Securities Law; 2) the cases cited by the Bankruptcy Court are distinguishable from the facts of this case; and 3) the Bankruptcy Court's narrow reading of the definition of "agent" would hinder the Bureau Chief's ability to protect the investing public and weaken the strong enforcement powers that the Legislature bestowed on the Bureau Chief.

#### **A. A plain reading of Section 49(b) of the Securities Law does not support the Bankruptcy Court's interpretation of "agent."**

The Bankruptcy Court's misinterpretation of "agent" fundamentally alters the plain reading of Section 49(b) by narrowing its scope. Section 49(b) defines agent as "any individual other than a broker-dealer, who represents a broker-dealer or

issuer in effecting *or attempting to effect* purchases or sales of securities."[3] (emphasis added.). The Bankruptcy Court essentially ignored the "attempting to effect" language of the statutory definition, while adding a requirement, absent in the statute, that the "agent" also be the "closer" in the sale or purchase of securities. If left uncorrected, the narrowed definition of "agent" will obstruct the Bureau's efforts to protect the investing public.

The "first step in interpreting a statute is to determine whether the language at issue has a plain and unambiguous meaning with regard to the particular dispute in the case." *Robinson v. Shell Oil Co.*, 519 U.S. 337, 340 (1997). "[The] inquiry must cease if the statutory language is unambiguous and 'the statutory scheme is coherent and consistent.'" *United States v. Ron Pair Enterprises, Inc.*, 489 U.S. 235, 240

---

[3] N.J. Stat. Ann. 49:3-49(b), in its entirety states

"Agent" means any individual other than a broker-dealer, who represents a broker-dealer or issuer in effecting or attempting to effect purchases or sales of securities. "Agent" does not include an individual who represents an issuer in (1) effecting transactions in a security exempted by paragraph (1), (2), (3), or (11) of subsection (a) of section 3 of P.L.1967, c.93 (C.49:3-50) ; (2) effecting transactions exempted by subsection (b) of section 3 of P.L.1967, c.93 (C.49:3-50); (3) effecting transactions with existing employees, partners, or directors of the issuer, if no commission or other remuneration is paid or given directly or indirectly for soliciting any person in this State; or (4) a broker-dealer in effecting transactions in this State limited to those transactions described in paragraph (2) of subsection (h) of section 15 of the "Securities Exchange Act of 1934," 15 U.S.C. s.78o(h)(2); or (5) such other persons not otherwise within the intent of this subsection (b), as the bureau chief may by rule or order designate. A partner, officer, or director of a broker-dealer or issuer, or a person occupying a similar status or performing similar functions, is an agent only if he otherwise comes within this definition. The bureau chief may by rule or order, as to any transaction, waive the requirement of agent registration. The bureau chief may by rule define classes of persons as "agents," if those persons are regulated as "agents" by the Securities and Exchange Commission or any self-regulatory organization established pursuant to the laws of the United States[.]

5

(1989); *see also Rosenberg v. XM Ventures*, 274 F.3d 137, 141 (3d Cir. 2001) ("Where the statutory language is plain and unambiguous, further inquiry is not required.") (citing *Santa Fe Med. Servs., Inc. v. Segal*, 57 F.3d 342, 345 (3d Cir. 1995)).  When determining whether a statute is unambiguous, courts look to the language itself, the specific context in which that language is used, and the broader context of the statute as a whole.  *Estate of Cowart v. Nicklos Drilling Co.*, 505 U.S. 469, 477 (1992); *McCarthy v. Bronson*, 500 U.S. 136, 139 (1991).

Here, the plain language of the definition of an "agent" is unambiguous – it covers one who is not only effecting but also "attempting to effect" the purchase or sale of securities.  The Bankruptcy Court, however, disregarded this plain meaning when it found Torres and Media Effective were not agents of NRIA because their "'agency' did not extend to transactions between NRIA and its investors," and that Torres was "not authorized to 'close' investments."  Bankruptcy Decision at 35.  By judicially engrafting a "closer" requirement on to the term "agent" the Bankruptcy Court disregarded the plain language of the statute.

The Bankruptcy Court's interpretation of "agent" also fundamentally violates another bedrock principle of statutory construction—that a statute should be construed so as not to render any of its words inoperative or superfluous.  *Paper Mill Playhouse v. Millburn Township*, 472 A.2d 517, 526 (N.J. Sup. Ct. 1984); *Abbotts Dairies, Inc. v. Armstrong,* 102 A.2d 372, 376 (N.J. Sup. Ct. 1954).

6

In its opinion, the Bankruptcy Court rewrote the definition of an "agent" when it read "attempting to effect" out of the statute rendering that phrase a nullity. The Court defined agent as "an individual representing an issuer of securities in the effectuation of purchases or sales of securities. This may include partners, officers, or directors of a securities issuer if their role was to effectuate sales." Bankruptcy Decision at 35. By rendering the "attempting to effect" language superfluous and reading it out of the statute, the Court significantly reduced the scope of whom the Legislature intended to encompass within the definition of "agent." The under-inclusive language mislead the Court into concluding Media Effective and Torres were not agents of NRIA.

The Bankruptcy Court's error in this regard is further reinforced by N.J. Stat. Ann. § 49:3-49(j)(2), which defines "offer" or "offer to sell" as "every attempt or offer to dispose of, or solicitation of any offer to buy, a security or interest in a security or investment advisory services for value." The foregoing language makes it clear that the legislature intended the Securities Law to reach the activities of not only those who actually sell securities but those who attempt to do so. That is exactly what happened here. As the Bankruptcy Court itself found, Torres and Media Effective "were a critical component of [NRIA's fraudulent] scheme" and that "Media Effective was paid by NRIA to place advertisements and maximize exposure that would attract as many new investors as possible." Bankruptcy Decision at 28.

7

And in fact, Torres and Media Effective's conduct was even more expansive than simply placing advertisements for NRIA. Torres and Media Effective engaged in diligent research and analysis to identify the appropriate media markets to reach a specific target audience for NRIA and personally altered the scripts that were being presented to pass through screening and reach the airwaves. Bankruptcy Decision at 10-11. The Bankruptcy Court's decision to ignore Media Effective and Torres' conduct, which amounted to, at the very least, "attempting to effect" the sale or purchase of securities within the meaning of Section 49(b), is thus not only inconsistent with its own factual findings but also the language of the statute.

The Bankruptcy Court also erroneously relied on the fact that "Torres was not authorized to 'close' investments," as determinative of whether someone is an agent. The statute, if read as the Bankruptcy Court did, would result in a distinction without a difference between who would purportedly be an agent and who would qualify as a "closer." The Court found that although "Mr. Torres signed an Agency of record with NRIA, which authorized Media Effective to buy advertising and media time with networks and stations on behalf of NRIA," and "should have known that NRIA was defrauding investors through its advertisements," this "'agency' did not extend to transactions between NRIA and its investors." Bankruptcy Decision at 35. The Court nevertheless concluded that Mr. Torres "was not authorized to 'close' investments" and Mr. Torres never "spoke to or procured an investment from an

8

individual." Bankruptcy Decision at 35. This constricted reading of "agent," to only encompass those authorized to "close" investments, would thwart the will of the Legislature in defining agents as those who represent a broker dealer or issuer in effecting *or attempting to effect* purchases or sales of securities.

### B. The case law cited by the Bankruptcy Court does not support its conclusion.

The Bankruptcy Court erroneously relied on *Zendell v. Newport Oil Corp.*, 544 A.2d 878 (N.J. Super. Ct. App. Div. 1988), and *Abrams v. Ohio Cas. Ins. Co.*, 731 A.2d 48 (N.J. Super. Ct. App. Div. 1999), to support its conclusion that Torres and Media Effective were not agents under N.J. Stat. Ann. § 49:3-49(b). Bankruptcy Decision at 33-34. In so doing, the Bankruptcy Court incorrectly analogized Torres' and Media Effective's activities as NRIA's "media manager" to the standard professional services performed by accountants and lawyers.

First, in its decision, the Bankruptcy Court cited to *Zendell* – which involved a claim against a law firm that provided legal services to an issuer of securities and was not involved in the marketing or advertising process – in support of its concern that interpreting the Securities Law to cover Appellees:

> would extend . . . liability to participants only remotely related to the relevant aspects of the sales transaction. Indeed, it might expose securities professionals, such as accountants and lawyers, whose involvement is only the performance of their professional services . . . to strict liability for rescission. The buyer does not, in any

9

> meaningful sense, "purchas[e] the security from" such a person.
>
> [Bankruptcy Decision at 33 (citing *Zendell*, 544 A.2d at 883).]

In *Zendell,* the New Jersey Superior Court, Appellate Division, affirmed the dismissal of Securities Law claims against a law firm that acted as counsel to an oil production company in which limited partnership units had been offered and sold to investors. 544 A.2d at 880. In support of its decision, the court relied on the fact that the law firm had no contact with any investor, was not a general partner in the venture, and did not act as broker, selling agent or underwriter. *Id*. at 882-83.

But *Zendell* does not support the Bankruptcy Court's concerns here. For one thing, the *Zendell* court analyzed an earlier version of the Securities Law, which predated the 1997 amendments that—among other changes—added liability to agents who materially aid both the "conduct" and the sale.[4] Furthermore, the *Zendell*

---

[4] The text of N.J. Stat. Ann. § 49:3-71(b) analyzed in *Zendell*, is similar to the current language of N.J. Stat. Ann. § 49:3-71(d) but was substantially narrower in its scope. Pre-1997 amendments, Section 71(b) stated:

> Every person who directly or indirectly controls a seller liable under paragraph (a), every partner, officer, or director of such a seller, every person occupying a similar status or performing similar functions, ever employee of such a seller who materially aids in the sale, and every broker-dealer or **agent who materially aids in the sale are also liable jointly and severally** with and to the same extent as the seller, unless the nonseller who is so liable sustains the burden of proof that he did not know, and in the exercise of reasonable care could not have known of the existence of the facts by reason of which the liability is alleged to exist. There is contribution as in cases of contract among the several persons so liable.

Section 71(d) which post-dates *Zendell*, reads "agent who materially aids in the sale *or conduct* are also liable jointly and severally . . .." With the 1997 amendments, the Legislature expanded the universe of conduct for which one may be liable as an agent in connection with sale of a security. Thus, the universe of individuals liable in connection with

10

court's analysis of section 12(1) liability (as well as the United States Supreme Court's interpretation of Congressional intent in section 12(1) in *Pinter v. Dahl,* 486 U.S. 622 (1988), upon which *Zendell* relied) is irrelevant given that the New Jersey Legislature intentionally differed from the federal law.

And even if the Bankruptcy Court was correct to rely on *Zendell*, it overlooked the fact that *Pinter* actually supports the Bureau's and Appellants' position.  Indeed, while the Supreme Court in *Pinter* declined to expand seller liability under the securities laws to a friend of the purchaser who gives "gratuitous advice" and "whose motivation is solely to benefit the buyer," 486 U.S. at 647, it affirmatively found that seller liability *could* encompass one "who successfully solicits the purchase, motivated at least in part by a desire to serve his own financial interests or those of [the seller]."  *Ibid*.  In so holding, the *Pinter* court stressed the importance of the "solicitation process":

> The solicitation of a buyer is perhaps the most critical stage of the selling transaction.  It is the first stage of a traditional securities sale to involve the buyer, and it is directed at producing the sale.  In addition, brokers and other solicitors are well positioned to control the flow of information to a potential purchaser, and, in fact, such persons are the participants in the selling transaction who most often disseminate material information to investors.  Thus, solicitation is the stage at which an investor is most likely to be injured, that is, by being persuaded to purchase securities without full and fair information.

the purchase or sale of securities is broader now than it was when *Zendell* was decided and *Zendell* is effectively inapposite.

11

*Id.* at 646-47.

This is exactly what the law firm in *Zendell* did not do but which Torres and Media Effective were paid, and paid well, to do – "to control the flow of information" to NRIA's victims. Torres was well aware that several networks were uncomfortable with NRIA ads but he found "workarounds" to get the networks to air them, and provided the media outlets with NRIA's scripts which promoted guaranteed return rates on investments, while knowing the return rates could not be guaranteed. Bankruptcy Decision at 15. Thus, not only the plain language – but the underlying purpose of the Securities Law – supports holding them liable as agents.

The Bankruptcy Court's reliance on *Abrams* fares no better. The *Abrams* Court found that the creditor of a general partner in a limited partnership was not liable under N.J. Stat. Ann. § 49:3-71(b) because the plaintiffs "failed to offer evidence that [the creditor] was either a seller or had control of a seller or the securities in question[.]" *Abrams*, 731 A.2d at 52. The Bankruptcy Court erroneously equated the "control person" liability in *Abrams*, which requires "active participation" in the management of the partnership, to that of the role of an "agent" as defined under Section 49(b). The *Abrams* court, however, did not interpret the meaning of the term "agent" in the context of the Securities Law. Instead, it dealt with "control person" liability, and dismissed the claim on the grounds that "[c]ontrol person liability under federal law has been construed to require a showing

12

of active participation in management, or of direct or indirect power over management or policies[.]" *Abrams*, 731 A.2d at 51-52. This distinction is important because Media Effective and Torres were agents under Section 49(b) – whether or not they could be "control persons" under *Abrams* is immaterial.

Ultimately, the Bankruptcy Court's failure to recognize the limitations of *Zendell* and misplaced reliance on an analysis in *Abrams* that addressed the meaning of "control person" liability instead of "agent" liability under the Securities Law led it to overlook the fact that liability under the Securities Law can extend to those who had "minimum participation in the sale." *See Cola v. Terzano*, 322 A.2d 195, 198-99 (N.J. Super. Ct. Law Div. 1974) (holding defendants could be liable under N.J. Stat. Ann. § 49:3-71(b) based on sister state court findings that "minimum participation in the sale" of securities is sufficient to satisfy a claim); N.J. Stat. Ann. § 49:3-75 ("This act shall be so construed as to effectuate its general purpose to make uniform the law of those states which enact similar laws[.]"). Because the cases cited by the Bankruptcy Court do not support its conclusion, the decision should be reversed.

### C. The practical implications of Bankruptcy Court's narrow interpretation of "agent" will hinder the Bureau's enforcement efforts to protect the investing public.

In addition to being plainly inconsistent with the statute and unsupported by the cases on which the Bankruptcy Court purported to rely, if left uncorrected, the

13

Bankruptcy Court's misinterpretation of "agent" could create a loophole in enforcement efforts by adding a requirement, absent in the statute, that an "agent" also be the "closer," when finalizing the sale of securities. At the same time, the decision would narrow the scope of who could be an agent by reading the term "attempting to effect" out of the statute, and in turn represent an unprecedented curtailment of the Bureau Chief's enforcement powers.

The Securities Law is intended to foster comprehensive investor protection and prevent securities fraud from being committed on the public at large. *See Higgins v. N.J. Bureau of Sec.*, 241 A.2d 660, 663 (N.J. Super. Ct. App. Div. 1968); *Cola v. Terzano*, 322 A.2d 195, 198 (N.J. Super. Ct. Law Div. 1974), aff'd sub nom, *Cola v. Packer*, 383 A.2d 460 (N.J. Super. Ct. App. Div. 1977). To accomplish its remedial purposes, the Securities Law should be construed liberally. *See Sabella v. Lacey Twp.*, 497 A.2d 896, 898 (N.J. Super. Ct. App. Div. 1985) (requiring liberal construction of remedial legislation); *Affiliated Ute Citizens v. United States*, 406 U.S. 128, 151 (1972) (holding securities legislation enacted for purpose of avoiding frauds to be construed not technically and restrictively, but flexibly to effectuate its remedial purposes); *SEC v. C. M. Joiner Leasing Corp.*, 320 U.S. 344, 353 (1943) (finding weight of authority supports liberal construction of state securities laws).

14

That has never been truer than now. In the age of social media, the securities markets have been riddled with new and upcoming "finfluencers"[5] who act as "agents" to effect or attempt to effect, the sale or purchase of securities.  The SEC has charged several high-profile individuals in these "finfluencer actions."  *See SEC Charges Kim Kardashian for Unlawfully Touting Crypto Security*, https://www.sec.gov/newsroom/press-releases/2022-183 (Oct. 3, 2022) (The SEC charged Kim Kardashian "for touting on social media a crypto asset security offered and sold by EthereumMax without disclosing the payment she received for the promotion. Kardashian agreed to settle the charges, pay $1.26 million in penalties, disgorgement, and interest, and cooperate with the Commission's ongoing investigation."); *Actor Steven Seagal Charged With Unlawfully Touting Digital Asset Offering*, https://www.sec.gov/newsroom/press-releases/2020-42 (Feb. 27, 2020) (The SEC charged Actor Steven Seagal "for failing to disclose payments he received for promoting an investment in an initial coin offering (ICO) conducted by Bitcoiin2Gen (B2G)."); *Two Celebrities Charged With Unlawfully Touting Coin Offerings*, https://www.sec.gov/newsroom/press-releases/2018-268 (Nov. 28, 2018) (The SEC charged professional boxer Floyd Mayweather Jr. and music producer

---

[5] "Finfluencers" are social media finance influencers.  Unlike investment advisors, who must register and comply with rules and regulations from authorities like the Securities and Exchange Commission, and state agencies, finfluencers bypass both the qualification required for, and regulations that govern investment advisors.  *See* Vijay Govindarajan, Anup Srivastava, and Chandrani Chatterjee, *How "Finfluencers" Can Create Risk for Your Company*, Harvard Business Review, https://hbr.org/2025/01/how-finfluencers-can-create-risk-for-your-company (Jan. 24, 2025).

15

Khaled Khaled, known as DJ Khaled, for "failing to disclose payments they received for promoting investments in Initial Coin Offerings (ICOs).").

Under the Bankruptcy Court's interpretation, not one of these individuals would be "agents" under Section 49(b), because they were not "closers" of the transactions, even though they were "attempting to effect" the sale or purchase of securities.[6]  This encumbrance on the Bureau's enforcement efforts is thus not only inconsistent with the "liberal construction" afforded to the Securities Law, it also would result in the Bureau's hands being tied in the face of conduct that is clearly actionable by its federal partners.  That is plainly a problem, particularly here, where Media Effective and Torres were far more deeply involved in the sale and purchase of securities than were the finfluencers charged by the SEC, given that the ads placed by Media Effective and Torres were "heavily involved in" and "a critical component" of the Ponzi scheme ran by NRIA.  Bankruptcy Decision at 9, 28.  NRIA was Torres' only client for ten years and "should have had intimate knowledge of its business and its personnel."  *Id*. at 13.

These facts make the Bankruptcy Court decision all the more of an outlier, and highlight just how severely it could impede the Bureau's enforcement efforts, particularly when compared to its federal counterpart.  Reversal of the Bankruptcy

---

[6] These cases are mentioned simply to aid the Court in understanding the far-reaching impact of an incorrect interpretation of "agent," as well as how such an interpretation may limit the Bureau Chief's enforcement powers and undercut his ability to safeguard the investing public.  This is not to suggest these individuals are in violation of the Securities Law.

16

Court's decision is warranted not only to bring the decision in line with the plain language of the statute, but also to reach contemporary means by which securities are actually marketed and offered to the investing public in an era of mass communication and social media.

**II.    The Court erred in interpreting the scope of "aiding and abetting" liability under N.J. Stat. Ann. 49:3-71(d).**

In addition to misinterpreting the statutory definition of "agent," the Bankruptcy Court also erred in interpreting aiding and abetting liability under the private civil liability provision of the Securities Law.

Liability for persons who "materially aid" a transaction is not based on the person's status, such as a "closer," but rather on their *conduct*. *§ 9:71 Secondary Liability Under States' Securities Laws—Persons or Firms Who Participate in or Materially Aid the Purchase or Sale—Material Aid or Participation*, 12A Blue Sky Law § 9:71 (emphasis added). Whether a person's participation in a transaction was "material" is a fact intensive inquiry. *Id*. In pertinent part, N.J. Stat. Ann. § 49:3-71(d) provides:

> *Every person who directly or indirectly controls a seller liable under subsection (a) of this section*, every partner, officer, or director of such a seller, or investment adviser, every person occupying a similar status or performing similar functions, every employee of such a seller or investment adviser who materially aids in the sale or in the conduct giving rise to the liability, and every broker-dealer, investment adviser, investment adviser representative *or agent who materially aids in the sale or*

17

> *conduct are also liable jointly and severally with and to the same extent as the seller or investment adviser.*

[(emphasis added).]

Here, the Bankruptcy Court intertwined two separate legal questions in determining that Torres and Media Effective were not agents for purposes of liability under the aiding and abetting provision. More specifically, it conflated *the conduct* that Torres and Media Effective engaged in with the incompatible positions or services provided by creditors, accountants, or lawyers, without first determining if Torres and Media Effective were agents under N.J. Stat. Ann. § 49:3-49(b).

Courts and legal scholars agree that if outside professionals and other vendors take an active role in the sale of securities, they can and should be considered agents and be held liable under the aiding and abetting provisions of the securities laws. *See Bennet v. Durham*, 683 F.3d 734, 739 (6th Cir. 2012) ("Under the Uniform Securities Act's definition [legal scholars] say that 'the term agent means only individuals who help to sell securities,' meaning that 'professionals such as attorneys and accountants[] would not qualify under this definition unless they became involved in the sales efforts.'") (citing and quoting *Secondary Liability for Securities Fraud: Gatekeepers in State Court*, 36 Del. J. Corp. L. 463, 482-83 (2011), and Douglas M. Branson, *Chasing the Rogue Professional After the Private Securities Litigation Reform Act of 1995*, 50 SMU L. Rev. 91, 120 (1996)) (other citations omitted). New Jersey courts are in accord, *see Terzano*, 322 A.2d at 198-99, as is

18

the plain language definition of the term "agent" under N.J. Stat. Ann. § 49:3-49(b). *See also Baker, Watts & Co. v. Miles & Stockbridge*, 620 A.2d 356, 368 (Md. Ct. Spec. App. 1993) (holding that an attorney could be considered an agent if they are "effecting or attempting to effect . . . the sale of securities" and that to rise to the level of "'effecting' . . . the attorney must actively assist in offering securities for sale, solicit offers to buy, or actually perform the sale."); *Ward v. Bullis*, 748 N.W.2d 397, 405 (N.D. 2008) (same); *Johnson v. Colip*, 658 N.E.2d 575, 578 (Ind. 1995) (holding "an attorney is an agent if ins[sic] or her affirmative conduct or failure to act when reasonably expected to do so . . . made it more likely than not that the investors would purchase than they would have been without such conduct or failure to act."); *CFT Seaside Inv. L.P. v. Hammet*, 868 F. Supp. 836, 844 (D.S.C. 1994) (holding that the definition of agent "covers persons who assist directly in offering securities for sale [and] soliciting offers to buy.").

Here, the Bankruptcy Court should have found that Torres and Media Effective "materially aided" in the sale of securities because Torres not only was the "Media Manager" for NRIA, but also "found workarounds to get the networks to air NRIA's ads." Bankruptcy Decision at 14. As the Bankruptcy Court correctly noted, Torres was in close contact with Salzano and heavily involved in NRIA's advertising. Bankruptcy Decision at 9. As "a one-man operation" whose "only client for ten years" was NRIA, *id*., Torres should have had "intimate knowledge of

19

its business and its personnel[.]" *Id*. at 13.  And indeed, Torres *was* aware of the multiple "red flags" from networks, which required NRIA to substantiate its claims of guaranteed returns, and was also aware several networks were uncomfortable with NRIA's ads.  Bankruptcy Decision at 14.  But instead of requiring NRIA to substantiate its claims, Torres found workarounds to get the networks to air NRIA's ads.  *Id*. at 14.  Worse still, when CNN refused to air NRIA's high risk investment ads, Torres stated he hoped other networks had not picked up on it yet and would allow the ads to "slide through."  *Id*. at 15.  Therefore, as the Bankruptcy Court also correctly found, while Torres denied knowledge of NRIA's fraudulent activities with investors, "it was in his self-interest" to do so. Bankruptcy Decision at 9.

For all of these reasons, that Torres and Effective Media did not actually close the transaction does not absolve them from liability as either an aider and abettor or an "agent" of NRIA. The Bankruptcy Court's own findings of fact established that Torres was a key player in facilitating NRIA's objectives of reaching its target audience and his conduct was necessary to NRIA's successful Ponzi scheme: "Mr. Torres was involved in the process of trying to substantiate NRIA's guaranteed returns claims in some cases, and in others, he conspired with Mr. Salzano to avoid any scrutiny of NRIA's advertisements."  *Id*. at 14. Because its ultimate conclusion was at odds both with the aiding and abetting provision and its own factual findings, the Bankruptcy Court's decision should be reversed.

20

* * *

For the reasons stated above, the Bankruptcy Court's decision to dismiss Count III of the AIRN's Amended Verified Complaint is not only contrary to the plain meaning of "agent" in N.J. Stat. Ann. 49:3-49(b) and to its own findings of fact under the Securities Law's "aider and abettor" liability provisions, it also fundamentally undermines the Bureau Chief's broad enforcement powers. Therefore, it must be reversed.

JENNIFER DAVENPORT
ATTORNEY GENERAL OF NEW JERSEY

By:   s/Brian F. McDonough
Brian F. McDonough
NJ Bar No. 026121980
*Assistant Attorney General*

By: s/Rahul Kapoor_____
Rahul Kapoor
NJ Bar No. 423832023
*Deputy Attorney General*

By:   s/Toral M. Joshi_____
Toral M. Joshi
NJ Bar No. 026182003
*Deputy Attorney General*

Dated: April 16, 2026

21